**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| AEI DRAWBACK SERVICES INC., DBA | § | |
| DHL DRAWBACK SERVICES, RADIX | § | |
| GROUP INTERNATIONAL, INC. DBA | § | |
| DHL GLOBAL FORWARDING | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | Civil Action No. 4:25-cv-5030 |
| ROBERT MICAH MCDONALD, NORTH | § | |
| AMERICAN DRAWBACK SERVICES, | § | Jury Trial Demanded |
| LLC, ALLISYN MCDONALD | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs AEI Drawback Services Inc. dba DHL Drawback Services ("AEIDS") and Radix Group International, Inc. dba DHL Global Forwarding ("DHL GF") (collectively, "DHL Drawback") file this Complaint for injunctive relief and damages against Defendants Robert Micah McDonald ("R. McDonald"), Allisyn McDonald ("A. McDonald"), and North American Drawback Services, LLC ("NADS").

## I.    INTRODUCTION

1.    In an egregious breach of his fiduciary obligations, contractual obligations and restrictive covenants, R. McDonald—while serving as President and an employee of AEIDS— formed a competing business and enlisted the assistance of two key AEIDS employees, A. McDonald and Jennifer Lyman ("Lyman"), to carry out a coordinated attack to misappropriate DHL Drawback's trade secrets and shut down AEIDS's business. Defendants surreptitiously emptied out AEIDS's Rochester office and moved into the office of R. McDonald's competing business a few minutes away. They solicited every single AEIDS employee for employment with NADS and coordinated a mass resignation where 13 employees resigned in a single day, either

departing immediately or abruptly going "Out of Office," making themselves unavailable or unwilling to transition any critical business information. The purpose of the attack, which included taking AEIDS's server offline for nearly a full business day, was to create confusion with customers as to whether there were any AEIDS employees left to service their business while Defendants took advantage of AEIDS's downtime to solicit customers to move their business to NADS. DHL Drawback seeks immediate injunctive relief and damages, including punitive damages, to address Defendants' egregious violations.

## II.   PARTIES, JURISDICTION, AND VENUE

2.      AEIDS is organized and exists under the laws of the State of Ohio, and is registered to do business in Texas. AEIDS's principal place of business is Houston, Texas.

3.      DHL GF is organized and exists under the laws of the State of Ohio, and is registered to do business in Texas.

4.      DHL GF is the sole owner of AEIDS.

5.      Defendant R. McDonald is the former manager and former President of AEIDS. He resides in Houston, Texas.

6.      Defendant A. McDonald resides in Houston, Texas.

7.      Defendant NADS is a Texas LLC with its principal place of business in Houston, Texas. NADS was formed on July 7, 2010 by R. McDonald. From its formation in 2010 until September 30, 2025, R. McDonald was the sole managing member of NADS.

8.      Under 28 U.S.C. § 1331, this Court has federal-question jurisdiction over DHL Drawback's Defend Trade Secrets Act ("DTSA") claim and Computer Fraud and Abuse Act ("CFAA") claim.

9.      Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remaining causes of action in this Complaint because they form part of the same case or controversy as DHL Drawback's federal claims.

10.     Venue is proper in the Southern District of Texas, Houston Division because Defendants' conduct about which DHL Drawback complains occurred in Houston, Texas.

11.     This Court maintains general personal jurisdiction over R. McDonald and A. McDonald because they are both Texas citizens.

12.     This Court maintains general personal jurisdiction over NADS because its principal place of business is in Houston, Texas.

### III.    FACTUAL BACKGROUND

### AEIDS Company Information

13.     AEIDS is engaged in the business of providing duty drawback services to companies. AEIDS's customers are businesses that import and export goods and pay customs duties, fees and taxes associated with the import and/or export of those goods. Duty drawback services include the filing and processing of claims with the applicable customs authority for the recovery of customs duties, fees and taxes on behalf of customers.

14.     AEIDS operates out of two offices—an office in Houston, Texas and another office in Rochester, New York.

### R. McDonald is Highly Paid as Both Manager and Employee to Manage AEIDS

15.     R. McDonald worked for a business that AEIDS acquired. He first became AEIDS's manager in or around 2003.

16.     In 2019, R. McDonald entered into a Management Agreement with DHL Drawback that became effective November 1, 2019. A true and correct copy of the Management Agreement is attached as Exhibit 1.[1]

17.     Pursuant to the Management Agreement, R. McDonald was engaged to provide "operational and management services" to AEIDS.

18.     R. McDonald's authority as manager of AEIDS was not without limits. The Management Agreement expressly contained limitations on his authority and, as President of the Board of AEIDS and an AEIDS employee, R. McDonald had fiduciary obligations and a duty of loyalty to act in the best interest of AEIDS.

19.     R. McDonald was well compensated for performing his duties as Manager under the Management Agreement. His compensation exceeded millions of dollars annually. In addition to the management fees he received, R. McDonald was compensated $250,000 per year as an employee of AEIDS.

20.     R. McDonald received—at his request—the management fees under the Management Agreement through NADS, an entity he formed in 2010. *See* Certificate of Formation, attached as Exhibit 2. DHL GF paid R. McDonald his management fees through NADS because it believed that NADS was not a competitive business, but rather an entity R. McDonald formed solely for the purpose of collecting AEIDS management fees.

21.     Indeed, R. McDonald represented to DHL GF, as recently as November 2023, that NADS "exists to receive management fee payments from DHL Drawback Services and is not competeting [sic] with DPDHL." *See* Declaration of Actual or Potential Conflict of Interest Form, attached as Exhibit 3.

---

[1] The Management Agreement is governed by Florida law. *See* Exh. 1, ¶ 27.

22.     As Manager of AEIDS, R. McDonald employed his sister, A. McDonald as Operations Leader, based in AEIDS's Houston, Texas office.

23.     He also employed Jennifer Lyman, Vice President of Operations, based in AEIDS's Rochester, New York office.

### R. McDonald Violates His Restrictive Covenants

24.     The Management Agreement contained a noncompetition restriction, a non-solicitation restriction, and confidentiality obligations.

25.     Pursuant to his noncompetition covenant, R. McDonald is restricted from engaging any Competitive Activity for the term of the Agreement and three years thereafter.[2] "Competitive Activity" is defined as "(i) providing of Duty Drawback Services, other than on behalf of AEIDS or one or more Affiliates of AEIDS, to any Customer . . . ; (ii) serving as an officer, director, member, manager, employee consultant, advisor agent or representative or otherwise be[ing] associated in any other capacity, with any person, corporation, partnership, limited liability company, sole proprietorship, association or other business enterprise engaged in the provision of Duty Drawback Services (each a 'Competitive Enterprise'); or (iii) owning or acquiring, directly or indirectly, any interest in any Competitive Enterprise." Exhibit 1, ¶ 14(a).

26.     R. McDonald's non-solicitation covenant applies to both employees and customers of AEIDS and restricts him from "solicit[ing] or induc[ing] any partner, stockholder, principal, director, officer, employee, agent or other representative of AEIDS or one or more Affiliates thereof to leave the employ or retention of AEIDS or such Affiliate or hir[ing] any of the foregoing[] persons and/or request[ing] or advis[ing], explicitly or implicitly, any Customer of

---

[2] While the noncompetition restriction is longer than two years, DHL Drawback seeks to enforce the restriction for only a two-year period.

AEIDS, or any of AEIDS's agents to withdraw[,] curtail or cancel its business relationships with AEIDS or any Affiliate therefore, or otherwise . . . provid[ing] Duty Drawback Services to any Customer."[3] *Id.*, ¶ 14(b).

27.    R. McDonald also agreed that he would "not directly or indirectly interfere with any customer or business relationship of AEIDS or any Affiliate thereof, or induct or assist anyone in inducing in any way any employee of AEIDS or any Affiliate thereof to resign from or sever employment with, or to breach an employment contract with, AEIDS or such Affiliate." *Id.*

28.    These covenants in the Management Agreement are reasonably necessary to protect AEIDS's legitimate business interests, including safeguarding its confidential information and trade secrets; protecting its substantial relationships with specific existing customers; and preventing the loss of goodwill among customers as a result of its employees leaving their employment.

29.    To operate its business and distinguish itself from competitors, AEIDS generates and relies on confidential information, including trade secrets.  This confidential information includes AEIDS's business operation methods; billing/rate information; customer lists, which contain the identities of its customers; customer-related account information and files, including customer contract details; prospective customer pipelines; and information contained in AEIDS's claims processing software

30.    AEIDS takes reasonable steps to protect the confidentiality of this information, including by ensuring that its employees comply with confidentiality obligations in customer non-disclosure agreements, password protecting systems to ensure that only authorized employees can

---

[3] While the non-solicitation restriction is longer than two years, DHL Drawback seeks to enforce the restriction for only a two-year period.

access the information, and appropriately restricting access to information to only those employees with a business need.

31.     In violation of his noncompetition and non-solicitation covenants, R. McDonald, through others such as A. McDonald and Lyman, solicited AEIDS employees for employment with NADS, solicited customers to terminate their relationship with AEIDS and work with NADS, and engaged in Competitive Activity.

32.     R. McDonald also agreed to keep confidential, and to not "directly or indirectly disclose to any third person or entity, or use or cause to be used in any manner adverse to the interests of AEIDS or any Affiliate or parent company thereof, any Confidential Information." *Id.*, ¶ 11. Upon the termination of the Agreement, R. McDonald was required to return to AEIDS all Confidential Information, which includes "information disclosed to [him] or known by [him] as a consequence of this Agreement about AEIDS's or such Affiliate or parent company's employees, directors, officers, partners, shareholders, advertising methods, public relations methods, business plans, processes, trade information, methods and forecasts, customer, customer and vendor lists, finances, trademarks, trade secrets and other intellectual property and any other information which [he] should reasonably understand to be confidential." *Id.*

33.     In violation of his contractual confidentiality obligation, R. McDonald, both directly and indirectly, used and disclosed AEIDS's confidential information for the benefit of a competitor, NADS.

**<u>Misconduct By R. McDonald and A. McDonald Leading Up To The Termination of the Management Agreement With Cause</u>**

34.     In or around May 20, 2025, a then-AEIDS employee informed DHL GF that he believed R. McDonald was either engaging in conduct competitive to AEIDS or that he planned

to soon compete with AEIDS. DHL GF investigated the report but was unable to confirm at that time whether R. McDonald was engaging in competitive activity or preparing to soon compete.

35.     On August 26, 2025, DHL GF informed R. McDonald that it would not be renewing the Management Agreement, which was set to expire by its own terms on November 1, 2025. DHL GF told R. McDonald that it would be restructuring the AEIDS business to more closely align with other DHL entities. While R. McDonald would remain as Manager of AEIDS through the expiration of the Management Agreement, DHL GF requested R. McDonald's cooperation in the upcoming restructuring and transition to new leadership during the final weeks of the Management Agreement term. Although R. McDonald initially agreed to cooperate, he later refused.

36.     On August 26, 2025, DHL GF visited AEIDS and discussed the upcoming restructuring with AEIDS employees in the Houston and Rochester offices. Except R. McDonald and his personal assistant who did not perform work for AEIDS, all AEIDS employees, including A. McDonald and Lyman, were provided retention agreements to remain employed through the integration of AEIDS into DHL GF. Eleven employees, including A. McDonald and Lyman, signed retention agreements indicating their intention to remain with AEIDS after the expiration of the Management Agreement.

37.     Within days of DHL GF providing retention agreements to AEIDS employees, on September 5, 2025, R. McDonald summarily terminated the employment of the AEIDS employee who reported him for possible competitive activity, effective immediately. Despite the employee having received a retention agreement, R. McDonald singled out this employee for termination and told him that his services were no longer needed due to the "restructuring."

38.    Sometime in late September 2025, DHL GF learned that R. McDonald and Lyman had expressly engaged AEIDS's IT vendor on behalf of AEIDS to develop a proprietary duty drawback claims processing software. The cost of the software development was nearly $500,000.

39.    Although the Management Agreement required DHL GF's prior written consent for R. McDonald to enter into any transaction that would require an obligation to expend more than $250,000, R. McDonald neither disclosed to DHL GF nor sought nor obtained written consent to enter into the transaction.

40.    Without DHL GF's knowledge or consent, R. McDonald and Lyman used AEIDS resources to work on the development of the new software throughout 2025. Upon learning of the new software development, DHL GF began investigating the scope and purpose of the IT vendor's engagement and ultimately learned that R. McDonald intended to use the new software for his competing business, NADS.

**Termination of the Management Agreement With Cause**

41.    In preparing to compete in violation of his noncompetition obligation, on September 30, 2025, R. McDonald removed himself as sole Managing Member and Director of NADS and replaced himself with Scott Armstrong, a former AEIDS employee who retired in 2024. A true and correct copy of the NADS Certificate of Amendment is attached as Exhibit 4.

42.    On October 1, 2025, R. McDonald sent an email to DHL GF's Vice President Alejandro Palacios stating, "I appreciate your decision to separate, but is AEIDS terminating the Managing Agreement or allowing it to expire? Either way, I understand that I am being terminated without cause, and I respect that decision by the Company."

43.    Palacios responded, confirming that "[w]e are not terminating the Management Agreement; it is a term agreement and will expire at the end of the current term." Palacios also

told R. McDonald that his "employment is ending because we do not have a role for you in the new structure" and that his "employment is at-will and is not tied to the Management Agreement."

44.     DHL GF reiterated its request for R. McDonald to cooperate in the transition to new leadership for the purpose of ensuring continuity of business operations at the end of the Management Agreement term. Because the incoming leader of AEIDS, Brian London ("London"), was already an employee of DHL GF (AEIDS's sole owner), there should have been no concerns about sharing information with him about AEIDS's operation. However, any concerns R. McDonald raised were addressed by DHL GF.

45.     Despite his obligations under the Management Agreement and his fiduciary obligations as both President and Manager of AEIDS, R. McDonald refused to work with London to ensure a smooth transition in the final weeks of the Management Agreement term.

46.     After confirming that R. McDonald had engaged in competitive activity in violation of his noncompetition obligation, combined with his other violations of the Management Agreement and his fiduciary obligations to AEIDS, on October 13, 2025, DHL GF terminated the Management Agreement With Cause.

### R. McDonald, A. McDonald and Lyman Solicit AEIDS Employees and Customers and Breach AEIDS's Systems, Effectively Shutting Down AEIDS's Business for Several Days

47.     The same day that DHL GF terminated the Management Agreement With Cause, R. McDonald, A. McDonald and Lyman put their coordinated plan of attack into action to (i) solicit every single one of AEIDS's employees; (ii) empty AEIDS's offices and move to a different location in NADS's name; (iii) pack up AEIDS customer information and send it directly to the customers so they would have it in their possession when NADS requested it from them; (iv) solicit AEIDS's customers to move their accounts to NADS; and (v) lock AEIDS out of its own systems and office, for the purpose of ensuring that AEIDS was unable to service its clients.

48.     First, A. McDonald and Lyman instructed AEIDS employees to pack up customer files and send them directly to the customers.

49.     Then, with full knowledge that many of the AEIDS employees had already signed retention agreements with DHL GF, A. McDonald handed out NADS job offers to AEIDS employees. The job offers were for positions with NADS that were similar or identical to the positions the employees held for AEIDS and expired on October 17, 2025 at 5 p.m. To induce AEIDS employees to accept the NADS job offers, on October 15, 2025, A. McDonald told AEIDS employees that DHL GF would not pay them the bonuses promised to them but NADS would pay their AEIDS bonuses if they accepted the NADS offers. This was a blatant misrepresentation, as any communication to AEIDS employees about bonuses would have come from R. McDonald, A. McDonald or Lyman and DHL GF had no knowledge of any bonuses promised to AEIDS employees.

50.     In addition, to persuade older employees to accept the NADS job offers, they told AEIDS employees that DHL GF would not hire employees over 60. This was also a blatant misrepresentation, as DHL GF gave retention agreements to all AEIDS employees (except R. McDonald and his personal assistant), regardless of age.

51.     A. McDonald engaged in this egregious misconduct on behalf of R. McDonald and NADS while still employed by AEIDS.

52.     Defendants' plan worked. In a single day, nine AEIDS employees resigned, three employees "retired," and one employee indicated he had been "fired."

53.     As part of the coordinated attack to shut down AEIDS, five of the resigned/retired employees abruptly placed their emails on "Out of Office" with a return date of October 31, 2025, leading clients to believe there were no AEIDS employees left to service their accounts.

54.    During the mass resignation day, Lyman also resigned, effective immediately. Lyman's resignation—with no notice or transition whatsoever—was particularly harmful to AEIDS because Lyman held administrative rights to AEIDS's systems and accounts. When DHL GF contacted Lyman to coordinate the transition of critical business information (including login with administrative rights and systems access information), and to obtain keys to the Rochester office, she refused to cooperate. Instead, she left the keys to the office inside the locked office, effectively locking DHL GF out.

55.    Then, on the day she resigned while DHL GF was taking steps to investigate why every single one of its Rochester employees resigned on the same day, AEIDS's server suddenly went offline for nearly a full business day and Lyman, using AEIDS's confidential information, immediately began contacting AEIDS customers, soliciting them to move with her and R. McDonald to NADS.

56.    Unlike the others, A. McDonald did not resign. Instead, consistent with Defendants' plan to attack AEIDS from both inside and outside of the business, she stayed behind to be able to share information with R. McDonald and Lyman about the employees who did not immediately depart and about how clients were being serviced while the business was under attack. Indeed—while still employed by AEIDS and using AEIDS's confidential information—A. McDonald began contacting clients stating that she was not sure how AEIDS would be able to service their accounts, thereby planting seeds of doubt in clients' minds in order to induce them to move their accounts to NADS. When it learned of her misconduct, DHL GF immediately removed her from her position.

57.    In an effort to preserve the business, DHL GF representatives went to the Rochester office of AEIDS on October 16, 2025. What they found was alarming. R. McDonald, Lyman and other former AEIDS employees acting in concert with NADS had cleared out the Rochester office

with only a few DHL GF laptops and printers left behind. The Rochester office was so bare that the management company for the building believed AEIDS had already moved out of the office some time ago. In a clear breach of his obligations under the Management Agreement and his fiduciary obligations to AEIDS, the move-out in AEIDS's Rochester office likely occurred while R. McDonald was still serving as Manager.

58.    Upon information and belief, the contents of the AEIDS office were moved to an NADS office located in Pittsford, New York, about 20 minutes away from AEIDS's Rochester office.

### NADS' OPERATIONS

59.    NADS is engaging in a business that competes directly with AEIDS.

60.    NADS is listed with the U.S. Customs and Border Protection as a "Permitted Customs Broker" under Filer Code "NAS." The telephone number associated with NADS's listing with the U.S. Customs and Border Protection is a number associated with R. McDonald.

61.    NADS is operating in direct competition with AEIDS. NADS operates at the direction of R. McDonald, A. McDonald and Lyman.

62.    Upon information and belief, several former AEIDS employees have already begun working on behalf of NADS, and NADS employees or agents have had ongoing contact with several AEIDS customers about moving their accounts to NADS.  Upon information and belief, R. McDonald and A. McDonald will continue to use the information they stole to engage in competitive activities, including on behalf of NADS, and continue to cause irreparable harm to DHL Drawback.  Indeed, beginning on October 20, 2025, at least one AEIDS customer terminated its services agreement with AEIDS.

## IV.    CAUSES OF ACTION

**Count I: Breach of Contract – Confidentiality Covenant (R. McDonald)**

63.    DHL Drawback incorporates Paragraphs 1-62 above as if set forth below.

64.    R. McDonald entered into the Management Agreement.

65.    In consideration for R. McDonald's obligations under the Management Agreement, DHL Drawback agreed to pay him management fees.

66.    The Management Agreement includes a confidentiality provision under which R. McDonald agreed that he would not divulge DHL Drawback's Confidential Information—which includes, but is not limited to, "information disclosed to [R. McDonald] or known by [R. McDonald] as a consequence of this Agreement about AEIDS's or such Affiliate or parent company's employees, directors, officers, partners, shareholders, advertising methods, public relations methods, business plans, processes, trade information, methods and forecasts, customer, customer and vendor lists, finances, trademarks, trade secrets and other intellectual property and any other information which [R. McDonald] should reasonably understand to be confidential"— except as required by the proper performance of his duties for AEIDS or authorized by law.

67.    R. McDonald has breached his disclosure covenant by disclosing Confidential Information to NADS, a competitive company which R. McDonald founded and continues to control directly or indirectly.

68.    DHL Drawback has suffered damages and will continue to suffer damages as a direct and proximate consequence of the breaches and anticipated breaches of R. McDonald's confidentiality obligations.  Accordingly, DHL Drawback is entitled to recover compensatory and consequential damages.

69.     DHL Drawback is also entitled to prospective injunctive relief to prevent R. McDonald from further disclosing DHL Drawback's Confidential Information, as agreed to under his Management Agreement.

**Count II: Breach of Contract – Non-Solicitation Covenant (R. McDonald)**

70.     AEIDS incorporates Paragraphs 1-69 above as if set forth at length below.

71.     R. McDonald entered into the Management Agreement.

72.     In consideration for R. McDonald's obligations under the Management Agreement, DHL Drawback agreed to pay him management fees.

73.     The Agreement includes an express employee and customer non-solicitation provision prohibiting R. McDonald, for a period after his separation from AEIDS, from "solicit[ing] or induc[ing] any partner, stockholder, principal, director, officer, employee, agent or other representative of AEIDS or one or more Affiliates thereof to leave the employ or retention of AEIDS or such Affiliate or hire any of the foregoing[] persons and/or request or advise, explicitly or implicitly, any Customer of AEIDS, or any of AEIDS's agents to withdraw[,] curtail or cancel its business relationships with AEIDS or any Affiliate therefore, or otherwise to provide Duty Drawback Services to any Customer."

74.     Upon information and belief, R. McDonald breached the customer non-solicitation covenant in his Management Agreement by soliciting AEIDS customers to induce them to withdraw, curtail, and/or cancel their business relationships with AEIDS and transfer their business to NADS.  As a result, beginning on October 20, 2025, at least one AEIDS customer terminated its business relationship with AEIDS.

75.    Upon information and belief, R. McDonald further breached the non-solicitation covenant in his Management Agreement by soliciting AEIDS employees to induce them to resign from AEIDS and by offering them employment with NADS.

76.    DHL Drawback has suffered damages and will continue to suffer damages as a direct and proximate consequence of R. McDonald's breaches and anticipated breaches of the non-solicitation covenants.  Accordingly, DHL Drawback is entitled to recover compensatory and consequential damages.

77.    DHL Drawback is also entitled to prospective injunctive relief to prevent R. McDonald from further soliciting other AEIDS employees and clients, as agreed to under his Agreement.

### Count III: Breach of Contract – Noncompetition Covenant (R. McDonald)

78.    DHL Drawback incorporates Paragraphs 1-77 above as if set forth at length below.

79.    R. McDonald entered into the Management Agreement as a condition of his employment with AEIDS.

80.    In consideration for R. McDonald's obligations under the Management Agreement, DHL Drawback agreed to pay him management fees.

81.    The Management Agreement includes an express noncompete provision prohibiting R. McDonald from engaging in any Competitive Activity for the term of the Agreement and three years thereafter.

82.    DHL Drawback terminated the Management Agreement With Cause after R. McDonald materially breached and/or failed to perform the manager duties set forth in the Agreement and engaged in fraud, dishonesty, gross negligence and/or willful malfeasance, and thus all the restrictive covenants set forth therein remain in effect.

83.    R. McDonald breached the noncompete covenant in his Management Agreement by working for NADS, a direct competitor of AEIDS, in a position that was substantially similar, if not identical, to the position that he maintained with AEIDS.  Upon information and belief, R. McDonald continues to act in a leadership role for NADS.

84.    DHL Drawback has suffered damages and will continue to suffer damages as a direct and proximate consequence of the breaches and anticipated breaches of R. McDonald's breaches of the noncompete covenant.  Accordingly, DHL Drawback is entitled to recover compensatory and consequential damages.

85.    DHL Drawback is also entitled to prospective injunctive relief to prevent R. McDonald from further breaching his noncompete covenant, as agreed to under his Management Agreement.

**Count IV: Breach of Fiduciary Duty (R. McDonald)**

86.    DHL Drawback incorporates Paragraphs 1-85 above as if fully detailed below.

87.    In his role as AEIDS's President over the course of many years, R. McDonald held a position of trust and confidence at AEIDS and owed AEIDS fiduciary duties that required him to exercise the utmost good faith, loyalty and honesty in the performance of his duties and to not obtain an improper advantage over DHL Drawback.

88.    R. McDonald breached his fiduciary duties owed to AEIDS by, without limitation, scheming to destroy AEIDS's business by misappropriating its trade secrets and other confidential information to a competitive company, NADS; joining the employ of that competitive company in order to impart on it an unfair advantage to the detriment of DHL Drawback; soliciting AEIDS employees and customers to terminate their relationships with AEIDS and to join NADs; taking over AEIDS's server to effectively shut it out from its own network; diverting and usurping

AEIDS's corporate opportunities; and making material misrepresentations and omissions in his dealings with DHL Drawback.

89.    As a direct and proximate result of R. McDonald's breaches of his fiduciary duty, DHL Drawback has suffered significant damages and R. McDonald has been wrongfully enriched.

**Count V: Tortious Interference with Customer Contracts (NADS, A. McDonald)**

90.    DHL Drawback incorporates Paragraphs 1-89 above as if fully detailed below.

91.    R. McDonald entered into the Management Agreement as a condition of his employment with AEIDS, and that Agreement includes valid and enforceable restrictive covenants.

92.    DHL Drawback terminated the Management Agreement With Cause after R. McDonald materially breached and/or failed to perform the manager duties set forth in the Agreement and engaged in fraud, dishonesty, gross negligence and/or willful malfeasance, and thus all the restrictive covenants set forth therein remain in effect.

93.    NADS knew about or had reason to know about the valid and enforceable restrictive covenants in the Agreement before hiring R. McDonald.  Indeed, R. McDonald himself founded NADS.  It is thus beyond dispute that NADS knew about the valid and enforceable restrictive covenants in the Management Agreement.  Despite this knowledge, NADS employed R. McDonald in a position that required him to breach the covenants in his Management Agreement by performing substantially similar responsibilities as those that he performed for AEIDS.

94.    A. McDonald is R. McDonald's sister and worked with him at AEIDS and, upon information and belief, was aware of her brother's restrictive covenant obligations set forth in the Management Agreement.  Despite this knowledge, A. McDonald schemed with R. McDonald to

solicit customers of AEIDS and induce employees to leave AEIDS and join NADS, in breach of the covenants in her brother's Management Agreement.

95.     NADS's and A. McDonald's interference with the Management Agreement has been willful and intentional, without legal right or privilege, and designed to interfere with DHL Drawback's contractual relations with R. McDonald.

96.     NADS's interference with the Management Agreement has proximately caused injury to DHL Drawback.

**Count VI: Violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq* (R. McDonald, A. McDonald, and NADS)**

97.     DHL Drawback incorporates Paragraphs 1-96 above as it set forth below.

98.     DHL Drawback's computers are used in interstate or foreign commerce and communication.

99.     DHL Drawback's protected computers are defined in the statute as high-speed data processing devices that perform logical, arithmetic, and/or storage functions.

100.    A. McDonald and R. McDonald knowingly and intentionally accessed, without authorization and/or exceeding authorization, DHL Drawback's protected computers/servers to obtain DHL Drawback's confidential information.

101.    Without authorization and/or exceeding authorization, A. McDonald and R. McDonald acted intentionally and recklessly to take AEIDS's server offline for nearly a full business day so that Defendants could cause significant damage to AEIDS's business and take advantage of AEIDS's downtime to solicit its customers and move their business to NADS.

102.    As a result of A. McDonald and R. McDonald's knowing and intentional actions, they have forfeited any property rights to their storage devices and any other personal property used to facilitate the commission of their wrongful conduct.

103.    As a result of A. McDonald and R. McDonald's knowing and intentional actions, DHL Drawback has sustained losses that, in the aggregate, exceed $5,000 in value over the last year, including expending resources to investigate the extent, scope, and effect of the unauthorized access to and copying of DHL Drawback's confidential information and taking down its server that impaired the integrity and/or availability of data, programs, systems, and information.

104.    A. McDonald and R. McDonald's violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, has caused DHL Drawback economic damages in an amount to be determined at trial.

105.    At all relevant times, R. McDonald and A. McDonald were employees and/or authorized representatives of NADS, and were acting within the course and scope of their employment and/or agency relationships with NADS when they committed the foregoing violations of the Computer Fraud and Abuse Act.  NADS, therefore, is liable for the acts of R. McDonald and A. McDonald in violation of the Computer Fraud and Abuse Act under the doctrine of respondeat superior, agency principles, and/or other applicable theories of vicarious liability.

### Count VII: Trade Secret Misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq* (R. McDonald, A. McDonald, NADS)

106.    DHL Drawback incorporates Paragraphs 1-105 above as if set forth below.

107.    DHL Drawback has spent substantial financial resources developing and maintaining the secrecy of its trade secrets—including its customer lists, customer-related account information and files, and information contained in AEIDS's claims processing software—for its exclusive benefit.  DHL Drawback's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by DHL Drawback's competitors or its employees, specifically including NADS and its employees.  DHL Drawback

does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized use and disclosure.

108.    Through their employment with AEIDS, R. McDonald and A. McDonald acquired DHL Drawback's trade secrets, as that term is defined under the DTSA, specifically including customer lists, customer-related account information and files, and information contained in AEIDS's claims processing software.

109.    DHL Drawback provided its trade secrets to R. McDonald and A. McDonald in confidence and with the understanding that R. McDonald and A. McDonald would use the trade secrets solely to perform their responsibilities with AEIDS.  R. McDonald and A. McDonald knew that DHL Drawback intended for all such trade secrets to remain confidential and to be used solely to perform their responsibilities with DHL Drawback.

110.    R. McDonald and A. McDonald, both directly and through Lyman and others acting on their behalf, have misappropriated, and threaten to continue to misappropriate, DHL Drawback's trade secrets for the benefit of NADS in violation of the DTSA. NADS has in turn misappropriated DHL Drawback's trade secrets.   In anticipation of NADS becoming fully operational in providing duty drawback services to customers, R. McDonald and A. McDonald accessed DHL Drawback's systems and misappropriated trade secrets related to DHL Drawback's customers and operations.

111.    Because Defendants misappropriated DHL Drawback's trade secrets and are threatening to continue doing so, Defendants have violated and threaten to continue violating the DTSA.

112.    The misappropriation by Defendants has been and continues to be willful and malicious, as evidenced by their actions in the months and weeks leading up to R. McDonald's separation from AEIDS.

113.    As a direct and proximate result of the conduct by Defendants, DHL Drawback has suffered significant losses and damages and is entitled to injunctive relief, restitution, exemplary damages, compensation, and attorneys' fees.

114.    Unless enjoined, Defendants' misappropriation and threatened misappropriation of DHL Drawback's trade secrets will cause irreparable harm and continued irreparable harm to DHL Drawback, for which it cannot be fully and adequately compensated unless Defendants are enjoined as requested.

### Count VIII: Trade Secret Misappropriation under the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. and Rem. Code § 134A, *et seq* (A. McDonald and NADS)

115.    DHL Drawback incorporates Paragraphs 1-114 above as if set forth below.

116.    DHL Drawback has spent substantial financial resources developing and maintaining the secrecy of its trade secrets—including its customer lists, customer-related account information and files, and information contained in AEIDS's claims processing software—for its exclusive benefit.  DHL Drawback's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by DHL Drawback's competitors or its employees, specifically including NADS and its employees.  DHL Drawback does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized use and disclosure.

117.    Through their employment with AEIDS, A. McDonald acquired DHL Drawback's trade secrets, as that term is defined under the Texas Uniform Trade Secrets Act ("TUTSA"),

specifically including customer lists, customer-related account information and files, and information contained in AEIDS's claims processing software.

118.    DHL Drawback provided its trade secrets to A. McDonald in confidence and with the understanding that A. McDonald would use the trade secrets solely to perform their responsibilities with AEIDS.  R A. McDonald knew that DHL Drawback intended for all such trade secrets to remain confidential and to be used solely to perform their responsibilities with DHL Drawback.

119.    A. McDonald, both directly and through Lyman and others acting on their behalf, have misappropriated, and threaten to continue to misappropriate, DHL Drawback's trade secrets for the benefit of NADS in violation of the TUTSA. NADS has in turn misappropriated DHL Drawback's trade secrets.  In anticipation of NADS becoming fully operational in providing duty drawback services to customers, A. McDonald accessed DHL Drawback's systems and misappropriated trade secrets related to DHL Drawback's customers and operations.

120.    Because Defendants misappropriated DHL Drawback's trade secrets and are threatening to continue doing so, Defendants have violated and threaten to continue violating the TUTSA.

121.    The misappropriation by Defendants has been and continues to be willful and malicious, as evidenced by their actions in the months and weeks leading up to R. McDonald's separation from AEIDS.

122.    As a direct and proximate result of the conduct by Defendants, DHL Drawback has suffered significant losses and damages and is entitled to injunctive relief, restitution, exemplary damages, compensation, and attorneys' fees.

123.    Unless enjoined, Defendants' misappropriation and threatened misappropriation of DHL Drawback's trade secrets will cause irreparable harm and continued irreparable harm to DHL Drawback, for which it cannot be fully and adequately compensated unless Defendants are enjoined as requested.

### Count IX: Trade Secret Misappropriation under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688 *et seq* (R. McDonald)

124.    DHL Drawback incorporates Paragraphs 1-123 above as if set forth below.

125.    DHL Drawback has spent substantial financial resources developing and maintaining the secrecy of its trade secrets—its customer lists, customer-related account information and files, and information contained in AEIDS's claims processing software—for its exclusive benefit.  DHL Drawback's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by DHL Drawback's competitors or its employees, specifically including NADS and its employees.  DHL Drawback does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized use and disclosure.

126.    Through his employment with AEIDS, R. McDonald acquired DHL Drawback's trade secrets, as that term is defined under the Florida Uniform Trade Secrets Act ("FUTSA"), specifically including customer lists, customer-related account information and files, and information contained in AEIDS's claims processing software.

127.    DHL Drawback provided its trade secrets to R. McDonald in confidence and with the understanding that R. McDonald would use the trade secrets solely to perform his responsibilities with AEIDS.  R. McDonald knew that DHL Drawback intended for all such trade secrets to remain confidential and to be used solely to perform his responsibilities with DHL Drawback.

128.    R. McDonald, both directly and through Lyman and others acting on his behalf, has misappropriated, and threatens to continue to misappropriate, DHL Drawback's trade secrets for the benefit of NADS in violation of the FUTSA. NADS has in turn misappropriated DHL Drawback's trade secrets.  In anticipation of NADS becoming fully operational in providing duty drawback services to customers, R. McDonald accessed DHL Drawback's systems and misappropriated trade secrets related to DHL Drawback's customers and operations.

129.    Because R. McDonald misappropriated DHL Drawback's trade secrets and are threatening to continue doing so, R. McDonald has violated and threaten to continue violating the FUTSA.

130.    The misappropriation by R. McDonald has been and continues to be willful and malicious, as evidenced by their actions in the months and weeks leading up to R. McDonald's separation from AEIDS.

131.    As a direct and proximate result of the conduct by Defendants, DHL Drawback has suffered significant losses and damages and is entitled to injunctive relief, restitution, exemplary damages, compensation, and attorneys' fees.

132.    Unless enjoined, Defendants' misappropriation and threatened misappropriation of DHL Drawback's trade secrets will cause irreparable harm and continued irreparable harm to DHL Drawback, for which it cannot be fully and adequately compensated unless R. McDonald and NADS are enjoined as requested.

## V.    REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

133.    DHL Drawback incorporates Paragraphs 1-132 above as if set forth below.

134.    Defendants have caused, are causing, and will continue to cause great and irreparable harm to DHL Drawback's business, which cannot be remedied adequately by an award of monetary damages.

135.    The irreparable harm includes Defendants' misappropriation of DHL Drawback's trade secrets and/or confidential information; solicitation of DHL Drawback's customers and employees; and competition against DHL Drawback in breach of the Management Agreement.

136.    Unless immediately restrained, Defendants will cause further irreparable harm to DHL Drawback for which there is no adequate remedy at law.

137.    As detailed in the motion that DHL Drawback will file, DHL Drawback is entitled to a temporary restraining order, preliminary injunction, and permanent injunction:

a)    restricting Defendants from directly or indirectly using or divulging, or threatening to use or divulge, for any reason, DHL Drawback's trade secrets and/or confidential information;

b)    restricting R. McDonald from directly or indirectly approaching, contacting, soliciting, or inducing any client, customer, employee, or contractor of AEIDS or DHL GF to enter into a business or employment relationship with NADS, R. McDonald or any company with which R. McDonald is associated, including NADS;

c)    restricting R. McDonald from directly or indirectly, on his own behalf or on behalf of any other company or person, including NADS, offering, providing, or servicing business from any client or customer of AEIDS related to duty drawback services;

d)      restricting R. McDonald from directly or indirectly taking any action intended, or reasonably likely, to cause an AEIDS client or customer to cease or refrain from doing business with AEIDS;

e)      restricting R. McDonald from engaging in competitive activities in violation of the noncompete covenant included in the Management Agreement; and

f)      restricting NADS and A. McDonald from encouraging or conspiring with R. McDonald to violate or circumvent R. McDonald's compliance with the restrictive covenants in the Management Agreement.

## VI.    BOND

138.    Bond should be set at a reasonable amount.  DHL Drawback seeks only to maintain the status quo by enforcing its agreement with R. McDonald and preventing NADS from unlawfully competing through R. McDonald's and A. McDonald's stolen trade secrets and confidential information, and to stop other ongoing unlawful activity.

## VII.    CONDITIONS PRECEDENT

139.    All conditions precedent to DHL Drawback's claims for relief have been performed or have occurred or were otherwise met, waived, or excused.

## VIII.    JURY DEMAND

140.    DHL Drawback demands a trial by jury as to all claims that may be tried to a jury.

## IX.    PRAYER FOR RELIEF

141.    Furthermore, DHL Drawback respectfully requests that the Court:

a)  issue a temporary restraining order enjoining Defendants, as set forth above;

b)  after notice and a hearing, issue a preliminary injunction as requested above, pending a trial on the merits;

c)  after a trial on the merits, issue a permanent injunction ordering specific performance of the restrictive covenants included in the Management Agreement, as requested above;

d)  enter judgment in favor of DHL Drawback and against Defendants;

e)  award DHL Drawback all damages that it has sustained as a result of Defendants' wrongful conduct described above, beginning with the earliest date of violation up until the date of the entry of the final judgment in this action, including actual and consequential damages;

f)  award DHL Drawback punitive and exemplary damages;

g)  award DHL Drawback pre- and post-judgment interest;

h)  award DHL Drawback attorneys' fees and costs; and

i)  grant DHL Drawback all other relief, in law and in equity, to which DHL Drawback may be entitled.

Dated: October 21, 2025                    Respectfully submitted,

                                           */s/ Tyler J. Hill*
                                           Tyler J. Hill
                                           Texas Bar No. 24130505
                                           SDTX Federal ID No. 3815851
                                           Morgan, Lewis & Bockius LLP
                                           1717 Main Street, Ste. 3200
                                           Dallas, Texas 75201
                                           T: 214.466.4160
                                           F: 214.466.4001
                                           E: Tyler.J.Hill@morganlewis.com
                                           *Attorney in Charge*

                                           Jennifer Bullock
                                           *Pro Hac Vice admission forthcoming*
                                           Morgan, Lewis & Bockius LLP
                                           600 Brickell Avenue, Suite 1600
                                           Miami, FL 33131-3075
                                           T: 305.415.3000
                                           F: 305.415.3001
                                           E: jennifer.bullock@morganlewis.com

                                           Donald E. English, Jr.

*Pro Hac Vice admission forthcoming*
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
T: 202.739.3000
F: 202.739.3001
E: donald.english@morganlewis.com

*Counsel for Radix Group International, Inc. and
AEI Drawback Services, Inc.*